Matthew R. Mendelsohn, Esq. (Attorney ID: 015582005)
David A. Mazie, Esq. (Attorney ID: 015582005)
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 228-9898
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ZACHARY SMITH, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS, LLC; ONSTAR, LLC; LEXISNEXIS RISK SOLUTIONS, INC.; AND VERISK ANALYTICS, INC.,<br><br>Defendants. | No.<br><br>*CIVIL ACTION*<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiff Zachary Smith, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants General Motors, LLC ("GM"), OnStar, LLC ("OnStar"), LexisNexis Risk Solutions, Inc. ("LexisNexis"), and Verisk Analytics, Inc. ("Verisk") (each individually, a "Defendant" and collectively, the "Defendants"). Plaintiff alleges as follows based upon personal knowledge as to his own acts and experiences, and as to all other matters, upon information and belief, including an investigation conducted by his attorneys.

## NATURE OF THE ACTION

1. This case arises from Defendants' covert collection of consumers' private data, including but not limited to driving characteristics and behavior through computer software installed

in vehicles or via linked application, and the sharing, use, and sale of that data without consumers' notice, knowledge, or consent.

2. Modern vehicles, including Plaintiff's vehicle, are integrated with, or operated by, digital electronics and software. These components and software record and store a variety of information about a vehicle's operation, condition, and performance. Examples include distances traveled and service history. However, other less innocuous metrics are also recorded, including metrics that provide information about drivers and their driving behavior. Examples include a driver's average speed; percentage of time speeds exceed 80 miles per hour; the frequency and intensity of acceleration and braking; and late-night driving (collectively "Driver Data"). This Driver Data is recorded through vehicle software and applications often inaccessible to and unknown by consumers.

3. Defendants GM and OnStar install these types of driver-tracking features on numerous GM vehicles. These features are misleadingly marketed as a user experience enhancement, but instead they are used by GM and OnStar to surreptitiously capture Driver Data which are then sold for profit to third parties without the consumers' knowledge, notice, or consent.

4. Unbeknownst to Plaintiff and the putative class, Defendants GM and OnStar sell the recorded Driver Data to credit agencies and data aggregation companies, including Defendants LexisNexis and Verisk.

5. Defendants LexisNexis and Verisk then sell consumer Driver Data to companies, including but not limited to auto insurance companies who then use the ill-gotten data to increase quotes and premiums for consumers' automobile insurance.

6. These acts carried out by Defendants are all done for profit without Plaintiff's or the putative class's notice, knowledge, or consent. As result of Defendants' improper conduct, Plaintiff

and the putative class are forced to pay more money for their car insurance than they would had their private Driver Data not been shared.

7. Plaintiff Zachary Smith is one of many drivers whose Driver Data has been sold without his consent as part of this deceitful scheme. His GM vehicle, a 2023 Chevrolet Bolt, equipped with OnStar tracking software, collected his Driver Data without his knowledge and consent and sold that Driver Data to Defendants LexisNexis and Verisk. As a result, Plaintiff suffered economic injury, including increased insurance premiums and an inability to switch insurance providers without a substantial increase in premiums.

8. Plaintiff brings this action for economic damages and injunctive relief on behalf of all persons whose Driver Data were captured, collected, stored, and/or transferred or sold without full notice or consent. Defendants' wrongful conduct constitutes a violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq.; a violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq. ("NJCFA"); Violation of The Truth-In-Consumer Contract, Warranty and Notice Act ("TCCWNA"); breach of contract; common law invasion of privacy; and unjust enrichment.

## PARTIES

9. At all relevant times, Plaintiff Zachary Smith has resided in and been a citizen of Lawrenceville, New Jersey. Plaintiff purchased, owns and drives 2023 Chevrolet Bolt that was manufactured and sold by GM and is capable of supporting driver tracking software or applications operated or maintained by GM and/or OnStar.

10. Defendant GM is a Delaware limited liability company with its principal place of business in Detroit, Michigan. The sole member and owner of GM is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of

business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation, with its principal place of business in the State of Michigan, and is a citizen of Delaware and Michigan. At all times relevant, GM sold vehicles in New Jersey that included functionality for driving tracking software or applications, including but not limited to, OnStar, MyChevrolet, MyBuick, MyGMC and MyCadillac.

11. Defendant OnStar is a Delaware limited liability company with its principal place of business in Detroit, Michigan. The sole member of the OnStar is GM, or General Motors Holding LLC or General Motors Company, as described above. At all times relevant, OnStar operated driving tracking software or applications in New Jersey, including but not limited to OnStar, MyChevrolet, MyBuick, MyGMC and MyCadillac.

12. Defendant LexisNexis is a Delaware corporation with its principal place of business in Alpharetta, Georgia. At all times relevant to this Complaint, LexisNexis obtained drivers' behavior data and made it available to third parties including automobile insurance companies.

13. Defendant Verisk is a Delaware corporation with its principal place of business in Jersey City, New Jersey. At all times relevant to this Complaint, Verisk obtained drivers' behavior data in New Jersey and made it available to third parties including automobile insurance companies.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.*, because this case is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are greater than 100 putative class members; at least one putative class member is a citizen of a state other than the Defendants; and none of the exceptions under subsection 1332(d) apply.

15. This Court has jurisdiction over Defendants because Defendants have substantial aggregate contacts throughout the United States, the State of New Jersey, and this District. Defendants have engaged, and continue to engage, in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, the State of New Jersey, and this District, and Defendants have each purposely availed themselves of the laws of the United States and the State of New Jersey. In addition, Defendant Verisk's principal place of business is in New Jersey.

16. Venue is proper in this Court because the acts and omissions giving rise to this lawsuit took place in this District, Plaintiff resides in and is a citizen in this District, Verisk resides in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendants are subject to the personal jurisdiction of this Court.

## FACTUAL ALLEGATIONS

### A. Plaintiff Zachary Smith

17. Plaintiff Zachary Smith purchased a new 2023 Chevrolet Bolt equipped with OnStar from Pellegrino Chevrolet in Westville, New Jersey on or about April 3, 2023.

18. Plaintiff was never informed by GM or OnStar that his Driver Data would be collected and sold to third parties.

19. Plaintiff did not authorize GM or OnStar to collect and sell his personal Driver Data.

20. Plaintiff is not enrolled in and has never paid for OnStar services.

21. Plaintiff downloaded the MyChevrolet application for his vehicle and was not informed by the application prior to, during, or after the download of the application that his personal Driver Data would be collected by GM and/or OnStar and subsequently sold to third parties.

22. Plaintiff was never informed by GM or OnStar that use of the MyChevrolet application would result in the collection of his personal Driver Data or that his Driver Data would be sold for profit to third parties, including and specifically Defendants LexisNexis and Verisk. Plaintiff was also never conspicuously informed, through his MyChevrolet application or otherwise, that he could opt-out of the collection of his Driver Data through OnStar.

23. Unhappy with his insurance premiums, in or about November 2023, Plaintiff requested quotes from other automobile insurers, including but not limited to, State Farm and GEICO. Both of these quotes were substantially higher than Plaintiff's current automobile insurance premiums, so Plaintiff had no choice but to remain with his current automobile insurer.

24. Plaintiff requested and received a copy of his LexisNexis consumer file, which included 496 telematics reports recorded and transmitted by Defendants GM and OnStar to Defendant LexisNexis without his consent. These 496 reports included remarks and details on acceleration events, high speed events, hard brake events, driving times, and distances driven.

25. Plaintiff's LexisNexis consumer file also confirmed that information from Plaintiff's file had been provided to multiple inquiring automobile insurance companies, including State Farm and GEICO. Upon information and belief, as a result of State Farm and GEICO being provided with Plaintiff's telematics reports containing his Driver Data, the quotes that he received were significantly higher than they would have been if his Driver Data was not provided.

26. Plaintiff requested and received a copy of his Verisk consumer file that included all of Plaintiff's driving data (355 trips) between November 28, 2023 and March 17, 2024, which were recorded and transmitted by Defendants GM and OnStar to Defendant Verisk without his consent. These daily reports included details on the following for each day: "Number of Trips,", "Speeding

Events," Hard Braking Events," Rapid Acceleration Events," "Daytime Driving Minutes," "Nighttime Driving Minutes," and "Mileage." .

27. At no time prior to or after his purchase of his GM vehicle did Plaintiff consent to the transmission of his Driver Data to LexisNexis or Verisk.

28. Upon information and belief, the high insurance quotes Plaintiff received from State Farm and Geico resulting in his inability to switch insurance carriers to obtain lower premiums was a direct and proximate result of Defendants' sale of Plaintiff's personal Driver Data to third parties, including automobile insurance companies, without Plaintiff's consent, which constitutes unlawful deceptive acts and trade practices, an invasion of privacy, and a tortious interference, all of which served to unjustly enrich Defendants.

**B. GM and OnStar's Covert Collection, Tracking, and Transmission of Driver Data**

29. GM vehicles starting with model year 2015 have the capability to use OnStar software and related applications.

30. The software and applications, including MyChevrolet, MyBuick, MyGMC and MyCadillac, allow GM and OnStar to record, collect, store, and transmit data regarding vehicle condition (i.e. engine or transmission status, etc.), as well as other specific Driver Data. This Driver Data includes metrics with reports of average speed; percentage of time during which speed exceeds 80 miles per hour; the frequency and intensity of acceleration and braking; and late-night driving. This Driver Data is collected after each drive.

31. Contrary to Plaintiff's experience and the reports of multiple GM consumers, GM claims that it does not enroll drivers in OnStar and does not "collect driving behavior data" without consent. However, upon information and belief, GM and OnStar collect, track, store, share, and sell Driver Data irrespective of consumer consent.

32. Moreover, GM and OnStar do not adequately apprise and inform consumers that their Driver Data will be collected, tracked, furnished, and sold to third parties.

33. Importantly, the consumers are not compensated for the collection and sale of their Driver Data. To the contrary, GM and OnStar are compensated for the sale of the Driver Data to third parties who then in turn resell the Driver Data to other third parties, including automobile insurers.

34. As a result of the sale of the data to automobile insurers, consumers are provided higher insurance quotes and increased premiums for those drivers whose Driver Data has been surreptitiously sold.

35. GM and OnStar fraudulently represent that the data collected is part of "an optional service that provides customers with information about their driving behavior to help them maximize their vehicle's overall performance, reduce vehicle wear and tear and encourage safer driving."[1] However, this Driver Data collection is actually part of a surreptitious scheme used to increase revenue.

36. GM's and OnStar's disclosures do not indicate that either party will transmit or sell Driver Data to third parties or that those third parties in turn will transmit or sell that Driver Data to automobile insurance companies.

37. GM's and OnStar's disclosures also do not indicate that the ultimate sale of that Driver Data to third parties will result in higher premiums, higher quotes, or the possibility of being denied an insurance policy.

38. GM and OnStar failed to give adequate notice to its customers to properly inform them of these Driver Data selling practices to third parties or the harm the practice can cause.

[1] https://www.onstar.com/support/faq/smart-driver (last accessed May 8, 2024).

39. It wasn't until March 20, 2024 that GM and OnStar admitted to the egregious data collecting and selling practice, stating, "As of March 20, 2024, OnStar Smart Driver customer data is no longer being shared with LexisNexis or Verisk."[2]

40. Plaintiff and other class members suffered actual harm, and the risk of future harm, as a result of GM and OnStar's unfair and deceptive acts, including but not limited to the invasion of their privacy interests in their Driver Data, loss of control over their Driver Data, the sale of their Driver Data without compensation, and adverse credit reporting and impaired credit scores.

**C. LexisNexis and Verisk's Sale of Driver Data**

41. According to its website, LexisNexis is "a trusted decision analytics provider for industries around the globe including financial services, retail/ecommerce, logistics and telecommunications."[3]

42. As it relates to automobile insurers, LexisNexis states that it "help[s] insurers and automakers streamline business processes, control costs and improve customer experiences."[4]

43. LexisNexis has an Automakers division and offers a "Telematics Exchange" system to Automakers. LexisNexis represents on its website:

> Our device-agnostic telematics exchange receives and normalizes data from connected vehicles, mobile apps and third-party services. The driving behavior data is used to generate scores and attributes that are easily ingested into insurance carrier workflows to influence their value chain."[5]

44. LexisNexis describes that it "bring[s] automakers and insurance carriers together" by "turn[ing] connected car data into tangible driving behavior insights that can be leveraged within

[2] *Id.*
[3] https://risk.lexisnexis.com (last accessed May 8, 2024).
[4] *Id.*
[5] https://risk.lexisnexis.com/insurance/solutions-for-automakers (last accessed May 8, 2024).

insurance carriers' existing workflows."[6]

45. LexisNexis collects and consolidates third-party Driver Data to enable automobile insurers to "boost[] profitability."[7] Undoubtedly, these automobile insurers boost profitability by raising premiums or denying coverage to consumers the insurers deem to be too risky.

46. LexisNexis charges automobile insurers for Driver Data. According to the LexisNexis website, LexisNexis compiles data from public record as well as data received from "connected vehicles, mobile apps and third-party services."[8]

47. LexisNexis then uses this data to "generate scores and attributes that are more easily ingested into insurance carrier workflows to help better assess risk."[9] In short, LexisNexis sells personal Driver Data procured without consumer notice, knowledge, consent, or benefit therefrom to automobile insurers to help those automobile insurers fatten their bottom lines, which comes at a cost to those consumers whose Driver Data has been misappropriated.

48. Verisk provides analytics data to help insurers improve their profitability and growth. Verisk's website explains that "[i]nsurers need innovative solutions to meet customer needs and drive growth in the face of evolving risks, regulations, and macroeconomic challenges. As a strategic partner to the global insurance industry, our advanced data analytics, software, scientific research, and deep industry knowledge can help you along the path to profitable growth—now and in the future."[10]

49. Verisk explains that it compiles and stores Driver Data for use by auto insurers. It states, "Also included in Verisk's suite of solutions is the Verisk Data Exchange™, which is one

---

[6] *Id.*
[7] https://risk.lexisnexis.com/insurance/auto?intcmp=ushp.risk-decision-making.body.ins-auto (last accessed May 8, 2024).
[8] https://risk.lexisnexis.com/insurance/auto/quoting-underwriting (last accessed May 8, 2024).
[9] *Id.*
[10] https://www.verisk.com/insurance/ (last accessed May 8, 2024).

of the largest telematics data exchanges of its kind and contains more than 290 billion miles of driving data from consenting drivers of connected cars. The Verisk Data Exchange empowers auto insurers to access the driving behavior insights they need to provide telematics pricing and discounts instantly during the quoting process through the leading DrivingDNA® product family. With advanced analytics and data refinement capabilities, insurers who use Verisk's solutions can gain turnkey access to automotive telemetry that supports the development and growth of usage-based insurance. Numerous auto insurers have already connected to the Verisk Data Exchange, including four of the 10 largest U.S. carriers."[11]

50. Verisk also posted an article on its website on November 10, 2023 explaining how auto insurers can "get back to profitability." One of its suggestions is for auto insurers to "[l]everage connected-car telematics to elevate UBI [usage-based insurance] programs for a frictionless customer experience with a single API call, and use an insurance-ready driving score on actual driving behavior."[12]

51. LexisNexis and Verisk do not disclose that the Driver Data they sell to automobile insurers is procured from GM and OnStar without consumers' knowledge or consent.

52. LexisNexis and Verisk knowingly purchase Driver Data that is covertly collected by GM and OnStar to the detriment of the consumers whose Driver Data has been collected.

53. Further, this practice of covert collection of Driver Data via scant metrics functions in such a way that it paints an incomplete picture; without proper context and additional detail, the risk reports compiled and generated by LexisNexis and Verisk are not an accurate representation of

[11] https://www.verisk.com/company/newsroom/verisk-acquires-data-driven-safety-to-further-expand-auto-insurance-analytics/ (last accessed May 8, 2024)
[12] https://www.verisk.com/blog/personal-auto-is-off-roading-how-to-get-back-to-profitability/ (Last accessed May 8, 2024)

the individuals such reports relate to. As such, the procedures implemented by LexisNexis and Verisk do not assure maximum possible accuracy of the information concerning the individual described in the report.

54. Based upon Plaintiff's experiences, information, and belief, this Driver Data is ill-gotten, and that ill-gotten nature is not openly disclosed.

55. Every party incident to these transactions – GM, OnStar, LexisNexis, Verisk, and the automobile insurance companies – profits from the non-consensual, covert collection and sale of Driver Data, except for the consumers. This is all to the economic detriment of consumers, like Plaintiff, in the form of increased quotes and premiums.

56. Defendants collectively engaged in unfair or deceptive acts in the conduct of trade or commerce when they engaged in the conduct of profiting from the sale of Driver Data obtained without consumers' consent, knowing that the Driver Data would be disseminated to automobile insurance companies which resulted in harm to the consumers.

57. Plaintiff and other class members suffered actual harm, and the risk of future harm, as a result of GM and OnStar's unfair and deceptive acts, including but not limited to invasion of their privacy interests in their Driver Data, loss of control over their Driver Data, the sale of their Driver Data without compensation, and adverse credit reporting and impaired credit scores.

**D. Fraudulent Concealment, Tolling, and Continued Violations**

58. Plaintiff's and proposed class members' claims could not and did not accrue prior to the filing of this Complaint because each Defendant actively concealed and did not reveal their improper collecting, tracking, accessing, recording, storing, furnishing, or selling of Driver Data.

59. Plaintiff and other class members exercised reasonable diligence but could not discover each Defendant's wrongful conduct at an earlier time.

60. Because of this, Plaintiff and other class members did not discover, nor could they have discovered through reasonable and ordinary diligence, Defendants' deceptive, fraudulent, and unlawful conduct alleged herein. Each Defendant's fraudulent misrepresentations caused Plaintiff and other class members to believe that their Driver Data was not being improperly accessed.

61. In the alternative, any statute of limitation or prescriptive period is equitably tolled on account of fraudulent concealment. Each Defendant affirmatively concealed from Plaintiff and other class members its respective unlawful conduct.

62. Each Defendant's wrongful conduct and misrepresentation constitutes continuing violations for purposes of any limitations period.

## CLASS ALLEGATIONS

63. Plaintiff brings this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) against Defendants. Plaintiff seeks to represent the Class(es) defined below, to the extent class members from these jurisdictions can be grouped together for purposes of class treatment, and within the applicable limitations periods:

> NATIONWIDE CLASS: All persons residing in the United States who, within the applicable statute of limitations, had their vehicle's Driver Data collected by Defendants and shared with, for profit or otherwise, a third party without their consent (collectively, the "Class Members").

> NEW JERSEY CLASS: All persons residing in New Jersey who, within the applicable statute of limitations, had their vehicle's Driver Data collected by Defendants and shared with, for profit or otherwise, a third party without their consent (collectively, the "New Jersey Class Members").

Excluded from the Class are any members of the judiciary assigned to preside over this matter; any officer or director of Defendant; and any immediate family member of such officer or director.

64. Plaintiff reserves the right to narrow or expand the foregoing class definitions, or to create or modify subclasses, including state-specific subclasses, as the Court deems necessary.

65. Ascertainability: The Class members can be reasonably identified using information that is kept by Defendants and/or their agents in the usual course of business and/or is in Defendants' control.

66. Numerosity: Class Members are so numerous that individual joinder is impracticable. Upon information and belief, there are thousands of Class Members, making them so numerous that joinder of all members is impracticable. The exact number of Class Members is known by Defendants and can be easily identified through Defendants' records.

67. Typicality: Plaintiff's claims are typical of the claims of the Class he seeks to represent, because the factual and legal bases of Defendants' liability to Plaintiff and Class Members is the same, and because Defendants' conduct has resulted in similar injuries to Plaintiff and Class members. As alleged herein, Plaintiff and Class Members have all suffered damages as a result of Defendants' covert collection of consumers' Driver Data, including but not limited to driving characteristics and behavior through computer software installed in vehicles or via linked application, and the sharing, use, and sale of that Driver Data without consumers' notice, knowledge, or consent.

68. Commonality: There are many questions of law and fact common to the claims of Plaintiff and Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions include, but are not limited to, the following:

a. Whether GM vehicles equipped with OnStar software are capable of recording, storing, and transferring Class Members' Driver Data;

b. Whether GM and OnStar used such software to record, store, and transfer Class Members' Driver Data;

c. Whether GM and OnStar recorded, stored, and transferred Class Members' Driver Data without full knowledge and consent;

d. Whether GM and OnStar sold or otherwise supplied Class Members' Driver Data to third parties not referenced in their privacy statements, including consumer reporting agencies such as LexisNexis and Verisk without the knowledge and consent of Class Members;

e. Whether LexisNexis obtained Class Members' Driver Data without the knowledge and consent of Class Members;

f. Whether LexisNexis sold or otherwise supplied Class Members' Driver Data to third parties without the knowledge and consent Class Members;

g. Whether Verisk obtained Class Members' Driver Data without the knowledge and consent of Class Members;

h. Whether Verisk sold or otherwise supplied Driver Data to third parties without the knowledge and consent of Class Members;

i. Whether Defendants' conduct violates the FCRA, the NJCFA, and common law principles;

j. The amount and extent of damages to Plaintiffs and other Class Members as a direct and proximate result of Defendants' conduct, and the scope of monetary and injunctive relief as to same.

69. Superiority: Absent a class action, most Class Members would find the cost of litigating their claims to be prohibitively expensive and would thus have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

70. Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

71. Individual litigation also risks inconsistent or contradictory judgments and increases the costs of legal resolution of this matter for all parties and the court system. By contrast, the

proposed class action presents far fewer management difficulties and offers the benefits of single adjudication, economies of scale, and comprehensive supervision by this Court.

72. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class he seeks to represent. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other Class Members.

**COUNT I**
**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*.**
**(Against Defendant LexisNexis and Verisk)**

73. Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein and asserts this claim against LexisNexis and Verisk.

74. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. §1681e(b).

75. LexisNexis and Verisk, acting as consumer reporting agencies as defined by 15 U.S.C. §1681c(a)(1), have failed to implement procedures to maintain maximum possible accuracy regarding Plaintiffs' and the Class Members' Driver Data.

76. LexisNexis and Verisk have knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiff's and Class Members' driving abilities by taking such information out of context, and failing to provide consumers with the opportunity to review and correct their Driver Data.

77. As a result of LexisNexis and Verisk's conduct, insurance carriers and others who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiff's

and Class Members' driving abilities.

78. The foregoing deceptive acts and practices constitute willful reckless and/or negligent violations of the FCRA, including but not limited to 15 U.S.C.§1681e(2)(b).

79. As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(1); statutory damages pursuant to 15 U.S.C. §1681n(a)(1); punitive damages as the Court may allow pursuant to 15 U.S.C. §1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681n(a)(3) from Defendants.

80. As a result of each willful, reckless, or negligent noncompliance of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. §1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. §1681o(a)(2) from Defendants.

**COUNT II**
**Violation Of The New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. § 56 :8-1 *et seq.* ("NJCFA")**
**(Against Defendants GM and OnStar on behalf of the New Jersey Class only)**

81. Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

82. GM and OnStar each provided privacy statements together with the sale of their vehicles and software to Plaintiff and Class Members. GM and OnStar intended that Plaintiff and Class Members rely on these privacy statements, having them agree to the terms prior to receiving use of their services and their vehicles. None of the privacy statements disclosed that Plaintiff's and the Class Members' Driver Data would be provided to LexisNexis, Verisk, or other data aggregators for resale to other parties including insurance companies, or the extent to which GM and OnStar would profit from that Driver Data. GM has admitted that it has earned millions of dollars for the sale of such information.

83. Each defendant is a "person" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

84. The NJCFA prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

85. GM and OnStar's misrepresentations and omissions in their privacy statements were material because they were likely to deceive reasonable consumers about the extent to which their Driver Data would be shared. Plaintiff and the New Jersey Class Members would not have consented to share Driver Data had they known that their information would be sold and dispersed in such a fashion.

86. GM and OnStar intended to mislead Plaintiff and New Jersey Class Members and induce them to rely on their misrepresentations and omissions.

87. GM and OnStar acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded Plaintiff's and New Jersey Class Members' rights.

88. As a direct and proximate result of GM and OnStar's unconscionable and deceptive practices, Plaintiff and New Jersey Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including disclosure of their private Driver Data and from increased insurance rates and premiums or the inability to obtain auto insurance in addition to other expenses resulting from disclosure of their Driver Data.

89. Plaintiff and New Jersey Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

## COUNT III
**Violation Of NJCFA**
**(Against Defendants LexisNexis and Verisk on behalf of the New Jersey Class only)**

90. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91. LexisNexis and Verisk have knowingly and willfully engaged in the collection and production of inaccurate Driver Data regarding Plaintiff's and other New Jersey Class Members' driving abilities by taking such information out of context, and failing to provide consumers with the opportunity to review and correct any inaccurate Driver Data.

92. As a result of LexisNexis and Verisk's conduct, insurance carriers and others who view these consumer reports receive and, in turn, rely on an inaccurate representation of Plaintiff's and New Jersey Class Members' driving abilities.

93. Each defendant is a "person" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

94. The NJCFA prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

95. LexisNexis and Verisk's misrepresentations and omissions concerning their use of Driver Data were material because they were likely to deceive reasonable consumers about the extent to which their Driver Data would be shared. Plaintiff and the New Jersey Class Members would not have consented for Driver Data to be shared had they known that their Driver Data would be sold and dispersed in such a fashion.

96. LexisNexis and Verisk's intended to mislead consumers and induce them to rely on their misrepresentations and omissions, thus, injuring Plaintiff and New Jersey Class Members.

97. LexisNexis and Verisk acted intentionally, knowingly, and maliciously to violate NJCFA and recklessly disregarded Plaintiff's and New Jersey Class Members' rights.

98. As a direct and proximate result of LexisNexis and Verisk's unconscionable and deceptive practices, Plaintiff and New Jersey Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including disclosure of their private Driver Data and increased insurance rates and premiums or the inability to obtain auto insurance in addition to other expenses resulting from disclosure of their Driver Data.

99. Plaintiff and New Jersey Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

## COUNT IV
**Violation Of The Truth-In-Consumer Contract, Warranty And Notice Act ("TCCWNA")**
**(Against Defendants GM and OnStar on behalf of the New Jersey Class only)**

100. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101. Plaintiff and New Jersey Class Members are consumers within the meaning of N.J. Stat. Ann. § 56:12-15.

102. Defendants GM and OnStar are sellers within the meaning of N.J. Stat. Ann. § 56:12-15 and -17.

103. N.J. Stat. Ann. § 56:12-15 provides in relevant part that:

> "[N]o seller, creditor, lender or bailee may offer or enter into any written consumer contract or give or display any notice which includes any provision that violates a clearly established right of the consumer or responsibility of the seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed."

104. The NJCFA establishes clear legal rights in its protection of consumers and/or clear responsibilities for sellers to not engage in any misrepresentations or otherwise deceptive or unconscionable practices in selling to consumers. Likewise, New Jersey courts and the state legislature have clearly established the right to privacy, which Defendants GM and OnStar violated as described above. By violating the NJCFA and the right to privacy, Defendants GM and OnStar have also violated TCCWNA.

105. N.J. Stat. Ann. § 56:12-17 provides for statutory damages of not less than $100 for every violation of TCCWNA. As a result of Defendants' violations, Plaintiff and New Jersey Class Members are entitled to these statutory damages in addition to such other relief as is deemed just and proper.

**COUNT V**
**Breach of Contract**
**(Against Defendants GM and OnStar)**

106. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107. The GM Privacy Policy (General Motors U.S. Connected Services Privacy Statement) and OnStar Privacy Statements are valid contracts between GM, OnStar and Class Members, to which the parties agreed and in which the parties entered when a Class Member purchased a GM vehicle or used a GM vehicle and GM's connected services.

108. Class Members accepted the terms of the contract when they purchased a GM vehicle or used a GM vehicle and contracted for the connected services, and provided consideration to GM and OnStar through the purchase or use of the vehicle by which GM and OnStar obtained this consideration.

109. There was a meeting of the minds as to the terms of the contract, as further set for the below, which did not allow or reasonably contemplate GM's or OnStar's sale of the Driver Data to

a third party for use by that third party for determination of insurance premiums, or any other service unrelated to the operation of the vehicle.

110. The GM Privacy Policy specifically states that when a purchaser or user of a GM vehicle interacts with GM through its Connected Services, or through one of its apps, it may collect driving and performance information. It further states that such driving and performance data will only be shared "within GM, with automotive dealers, licensees, and companies with whom [GM enters] into business relationships, in order to develop, enhance, provide, service, maintain, and improve the safety, security, and quality of [GM's] products, programs, and services."

111. The GM Privacy Policy states that GM will collect, among other information, route history, driving schedule, speed, braking and swerving/cornering events, and vehicle direction, and sets forth under the section "How We may Use Your Information", a list of instances in which this information will be used. Nothing in that list indicates that this information will be sold to third parties for their use in determining and increasing insurance rates or any other service unrelated to the operation of a user's vehicle or to the enhancement of GM's products, programs and services.

112. The GM Privacy Policy further states that GM may "de-identify" this information to "share it with third parties for any legitimate business purpose", and that such businesses would only be those with which GM maintains a business relationship, in connection with their products and services, using as an example Sirius XM, an entity that provides services and products to GM vehicle owners.

113. Likewise, OnStar's privacy policies also fail to disclose that Class Members' Driver Data will be sold to third parties for their use in determining and increasing insurance rates or any other service unrelated to the operation of a user's vehicle or to the enhancement of GM's products, programs and services.

114. For example, OnStar's Privacy Statement for Application Services (last updated May

2, 2022) lists various ways they may use Class Members' Driver Data, none of which include the sale to third-parties for the purposes of use for determining automobile insurance rates or coverage. In fact, the only reference to Driver Data being shared with third-parties is if the Driver Data has been de-identified "in a way that it can't reasonably be associated with you or your vehicle."[13]

115. GM and OnStar have violated and breached the terms of their privacy policies by selling identifiable, driver specific Driver Data to third parties for money for purposes unrelated to the services and products provided to the vehicle owner.

116. The sale of the Driver Data was not related to developing, enhancing, providing, servicing, maintaining, and improving the safety, security, and quality of GM's products, programs, and services.

117. By selling the Driver Data to a third party who had a relationship with GM and OnStar but who was not engaged in providing, servicing, maintaining, and improving the safety, security, and quality of GM's products, programs, and services, GM and OnStar have breached their obligations under the privacy policies contracts and did not fulfill the terms of the contracts.

118. Plaintiff and Class Members have been damaged by GM's and OnStar's breach of their obligations under the privacy policies: (1) causing Class Members to pay higher insurance premiums for vehicle insurance; (2) preventing Plaintiff and Class Members from obtaining reasonably priced or any vehicle insurance; (3) causing Plaintiff and Class Members the loss and diminution of the value of their personal, identifiable Driver Data which has a value as GM and OnStar were able to sell such information for millions of dollars, and (4) causing Plaintiff and Class Members to overpay for their GM vehicle and OnStar or Connectivity services which failed to provide them with the promised security of their Driver Data.

---

[13] https://www.onstar.com/legal/privacy-statement (last accessed May 8, 2024)

119. As a result of GM's and OnStar's breach of contract, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT VI**
**Unjust Enrichment**
**(Against Defendants GM and OnStar)**

120. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121. Plaintiff and Class Members conferred a benefit upon GM and OnStar in purchasing their vehicles and software. GM and OnStar are in privity with Plaintiff and Class Members.

122. GM and OnStar appreciated or had knowledge of the benefits conferred upon them by Plaintiff and Class Members at the time they were received. Defendants also benefited from the receipt of Plaintiff's and the Class Member's Driver Data, without revealing the extent to which they would disclose and sell that data or benefit from same, to the detriment of Plaintiff and Class Members. Defendants thus unjustly enriched themselves at the expense of Plaintiff and Class Members by selling for profit their Driver Data without their knowledge and consent.

123. Under principles of equity and good conscience, GM and OnStar should not be permitted to retain the full value unjustly obtained from Plaintiff's and Class Member's Driver Data. Plaintiff and Class Members would not have willingly provided such data to Defendants had they known the extent to which their data would be disclosed.

124. GM and OnStar should be compelled to disgorge all unlawful or inequitable proceeds received by them because of their misconduct to Plaintiff and Class Members.

**COUNT VII**
**Invasion of Privacy**
**(Against Defendants)**

106. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107. New Jersey common law recognizes the tort of invasion of privacy, including claims for unreasonable intrusion upon the seclusion of another.

108. Plaintiff and Class Members have an objective, reasonable expectation of privacy in their own driving abilities, habits and patterns engaged in while they are in their own vehicles.

109. In violation of Plaintiff's and Class Members' reasonable expectation of privacy, Defendants intentionally intercepted, collected, transmitted, and sold Plaintiff's and Class Members' private Driver Data to unauthorized third-parties.

110. By engaging in this conduct, Defendants intentionally intruded or pried into Plaintiff's and Class Members' seclusion, solitude, or private life engaged in within the confines of their respective vehicles, without permission or consent.

111. Defendants' conduct is highly offensive to Plaintiff and any reasonable person, and constitutes an egregious breach of social norms underlying the right to privacy.

112. Defendants deprived Plaintiff and Class Members of the right to control how their personal information is received, used or disseminated and by whom.

113. Plaintiff and Class Members were harmed by Defendants' wrongful conduct which has caused Plaintiff and Class Members mental anguish and suffering, arising from their loss of privacy and the confidentiality of their own conduct within the confines of their own vehicle.

114. Defendants' conduct has needlessly harmed Plaintiff and Class Members by collecting and selling their private Driver Data resulting in mental anguish, as well as by causing actual damages in the form of increased insurance premiums, or the inability to obtain auto insurance at a reasonable rate or at all, and the diminution of the value of the personal data.

115. Defendants have improperly profited from their invasion of Plaintiff's and Class Members' privacy and their use of Plaintiff and Class Members personal Driver Data, for their economic value and their own commercial gain.

116. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiff and Class Members demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Classes, appointing Plaintiff as Class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Classes;

C. Enjoining Defendants from further violations of statutes and common law that would further damage Plaintiff and the Classes;

D. Awarding Plaintiff and the Classes damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Classes in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Classes leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting such other or further relief as may be appropriate under the circumstances.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: May 29, 2024

*/s/ Matthew R. Mendelsohn*
Matthew R. Mendelsohn
David A. Mazie
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Phone: (973) 228-0391
mrm@mazieslater.com
dmazie@mazieslater.com

*Attorneys for Plaintiff Zachary Smith, individually, and on behalf of all others similarly situated*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

I hereby further certify that to the best of my knowledge the matter in controversy is the not the subject of another action, pending arbitration or administrative proceeding in this District.

Dated: May 29, 2024

*/s/ Matthew R. Mendelsohn*

Matthew R. Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-0391

*Attorneys for Plaintiff Zachary Smith, individually, and on behalf of all others similarly situated*